**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| **CULP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **1:09CV611** |
| | ) | |
| **HUNTINGTON FABRICS, INC.,** | ) | |
| **CHIP WATERER, DEBBIE WATERER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

### I. Procedural Background

This matter is before the Court on Defendants' motion to dismiss for lack of personal jurisdiction. [Docket No. 12]. Plaintiff filed a complaint on August 12, 2009 alleging Defendants infringed on its copyright. [Docket No. 1]. Defendants moved pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure to dismiss the complaint. Subsequently, the Plaintiff filed, and the Magistrate Judge granted, a motion for leave to conduct jurisdictional discovery and respond to Defendants' motion. [Docket Nos. 14, 15]. Within the time period set in the Magistrate Judge's order, Plaintiff filed a brief in opposition to Defendants' motion [Docket No. 19] to which Defendants replied [Docket No. 21]. For reasons that follow, it is determined that this Court may not exercise jurisdiction over any Defendant.

### II. The Parties

Plaintiff (hereinafter "Culp") is a North Carolina corporation with its principal

place of business in High Point, North Carolina. Compl. ¶ 2.  Culp "is one of the world's largest marketers of upholstery fabrics for furniture" and, in 2005, created a fabric design known as "Palomino." Id. at ¶¶ 8, 9.  Culp owns the copyright for Palomino, effective June 15, 2006, under U.S. Copyright Registration Number VA1-429-919. Id. at ¶ 9.

Defendant Huntington Fabrics, Inc. (hereinafter "HFI") is a Mississippi corporation with its primary place of business in Tupelo, Mississippi. Decl. C. Waterer ¶ 2 [Docket No. 13, Ex. A]; Defs.' Resp. to Int. 5-6 [Docket No 19, Ex. C].  From 1989 to 2009[1], HFI was primarily a part of the wholesale fabric business. Id. at ¶ 3; Dep. C. Waterer 12 [Docket No. 19, Ex. A; Docket No. 21, Ex. A].  While HFI purchased and sold fabric, it did not manufacture or design fabric. Decl. C. Waterer ¶ 3.

Defendants Mr. and Mrs. Waterer, residents of Mississippi, each own fifty percent interest in HFI and serve as its two directors. Id. at ¶ 2; Dep. C. Waterer 10.  Mr Waterer is the President of HFI, as well as one of its sales representatives. Decl. C. Waterer ¶ 2.  In his role as President, Mr. Waterer makes all of HFI's decisions concerning purchases, sales, and advertising. Dep. C. Waterer 11.  Mrs. Waterer is the Vice-President, Secretary, and Treasurer of HFI, as well as one of its sales representatives. Decl. C. Waterer ¶ 2.  Unlike Mr. Waterer, Mrs. Waterer

---

[1]HFI closed business operations in October 2009, Dep C. Waterer 12, but remains in good standing with the Mississippi Secretary of State. Decl. C. Waterer ¶ 14.

makes no decisions regarding HFI's purchases, sales, or advertising. Dep. C. Waterer 11.

### III. The Allegations

Culp alleges that HFI "has violated Culp's exclusive right to reproduce, prepare derivative works of, distribute, and/or display publicly its copyrighted Palomino Design, in violation of 17 U.S.C. §§ 106 and 501." Compl. ¶ 23. Allegedly, HFI was "acquiring, importing, making, selling, displaying, reproducing, and/or distributing fabric with a design entitled Wyatt … which is identical or substantially similar to the Palomino Design, without authorization or license to do so." Id. at ¶ 12.  Culp further alleges that Defendants Mr. and Mrs. Waterer were aware of Culp's copyright over Palomino fabric, but "actively induced, caused, or materially contributed to" HFI's infringing actions. Id. at ¶¶ 16, 18, 24.  According to Culp, the conduct of Mr. and Mrs. Waterer was willful and knowing. Id. at ¶¶ 18, 26.

### IV. Personal Jurisdiction

Culp bears the burden of proving personal jurisdiction by a preponderance of the evidence. Myan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). When a court decides a dismissal motion without an evidentiary hearing, the plaintiff need only make a prima facie case of personal jurisdiction. Id.  Although an evidentiary hearing has not been held, the parties did pursue jurisdictional discovery.  As a result, in addition to the complaint and Defendants' initial brief in

3

support of their motion and accompanying affidavit of Mr. Waterer, the parties have submitted Defendants' responses to Culp's interrogatories concerning personal jurisdiction and excerpts of Mr. Waterer's deposition. <u>See</u> Docket No. 19, Exs. A, C; Docket No. 21, Ex. A.  This information is more similar to information presented at an evidentiary hearing than merely "motion papers, supporting legal memoranda, and the relevant allegations of a complaint." <u>Combs v. Bakker</u>, 886 F.2d 673, 676 (4th Cir. 1989).  Thus, Culp must prove by a preponderance of the evidence that this Court may exercise personal jurisdiction over the Defendants. <u>See</u> <u>AARP v. Am. Family Prepaid Legal Corp., Inc.</u>, 604 F.Supp.2d 785, 797 (M.D.N.C. 2009) (requiring plaintiff to prove jurisdiction by a preponderance of the evidence because the parties conducted jurisdictional discovery); <u>Trivette v. Risher</u>, No. 7:07-CV-16-D, 2008 WL 516747, at *1, n.1 (E.D.N.C. Feb. 25, 2008) (applying the preponderance of the evidence standard when the parties conducted jurisdictional discovery) (citing <u>Harrell v. Duke Univ. Health Sys., Inc.</u>, No. 7:07-813-HMH, 2008 WL 80122, at *1 (D.S.C. Jan. 7, 2008); <u>Brown v. Geha-Werke GmbH.</u>, 69 F.Supp.2d 770, 774 (D.S.C. 1999)).  Jurisdiction must be determined as to HFI, Mr. Waterer, and Mrs. Waterer separately. <u>Musselwhite v. Int'l Learning Works, Inc.</u>, No. 2:97CV460, 1997 WL 34588522, at *2 (M.D.N.C. Oct. 17, 1997) (citing <u>Calder v. Jones</u>, 465 U.S. 783, 790 (1984)).

Although this Court's subject matter jurisdiction is pursuant to 28 U.S.C. §§ 1331 and 1338, federal question jurisdiction and original copyright jurisdiction,

respectively, the Court "must engage in a two-step analysis" just as it would in diversity cases.[2] <u>Autoscribe Corp. v. Goldman</u>, No. 94-1749, 1995 WL 56662, at *1-3 (4th Cir. Feb. 3, 1995) (unpublished).  North Carolina's long arm statute must authorize the exercise of jurisdiction over Defendants, and the exercise of jurisdiction must not offend due process requirements of the Fourteenth Amendment. <u>Id.</u> at *3; <u>Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan</u>, 259 F.3d 209, 215 (4th Cir. 2001) (hereinafter "<u>Christian Sci. Bd. of Dirs.</u>").  Courts have interpreted North Carolina's long-arm statute, <u>see</u> N.C. Gen. Stat. § 1-75.4, to extend jurisdiction to the limits of the Due Process Clause. <u>See, e.g.</u>, <u>Christian Sci. Bd. of Dirs.</u>, 259 F.3d at 215 (determining whether the United States District Court for the Western District of North Carolina could exercise personal jurisdiction over a non-resident defendant); <u>Dillon v. Numismatic Funding Corp.</u>, 291 N.C. 674, 676 (1977).  Thus, the pivotal inquiry is whether exercising jurisdiction over Defendants comports with due process.

> Whether due process is satisfied must depend … upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.  That clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations.
> But, to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and

---

[2]The Fourth Circuit has held that a "national contacts" standard applies in federal question cases where federal law, such as Bankruptcy law, authorizes nationwide service of process. <u>Autoscribe Corp. v. Goldman</u>, No. 94-1749, 1995 WL 56662, at *3 (4th Cir. Feb. 3, 1995) (unpublished).  This is not the case here. <u>See</u> <u>id.</u> (applying two-step analysis to determine personal jurisdiction in copyright infringement case since national contacts standard inapplicable).

protection of the laws of that state.  The exercise of that privilege
may give rise to obligations; and, so far as those obligations arise out
of or are connected with the activities within the state, a procedure
which requires the corporation to respond to a suit brought to enforce
them can, in most instances, hardly be said to be undue.

Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945) (internal citations
omitted).

Therefore, the "constitutional touchstone," Burger King Corp. v. Rudzewicz,
471 U.S. 462, 474 (1985), is "whether the defendant has such 'minimal [sic]
contacts' with the forum state that 'maintenance of the suit does not offend
traditional notions of fair play and substantial justice.'" Christian Sci. Bd. of Dirs.,
259 F.3d at 215 (quoting Int'l Shoe Co., 326 U.S. at 316).  Even if a defendant
has minimum contacts with the forum state, it may still be unfair to require the
defendant to defend suit in the forum state.  Thus, a court may consider the
following factors to determine whether to exercise jurisdiction over a defendant
with minimum contacts in the forum state: (1) "the burden on the defendant," (2)
"the forum State's interest in adjudicating the dispute," (3) "the plaintiff's interest
in obtaining convenient and effective relief," (4) "the interstate judicial system's
interest in obtaining the most efficient resolution of controversies," and (5) the
"shared interest of the several States in furthering fundamental substantive social
policies." Burger King Corp., 471 U.S. at 477 (quoting World-Wide Volkswagen
Corp. v. Woodson, 444 U.S. 286, 292 (1980)).

A court may exercise specific or general jurisdiction over a defendant.

Specific jurisdiction exists when the cause of action arises out of or is related to the defendant's contacts with the forum state. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984) (hereinafter "Helicopteros"). To determine if specific jurisdiction exists, a court examines (1) whether the defendant purposefully availed itself of the privileges of conducting activities in the forum state, (2) whether the claims arise out of [or are related to] the defendant's activities in the state, and (3) whether the exercise of jurisdiction is constitutionally reasonable. Christian Sci. Bd. of Dirs., 259 F.3d at 216 (citing Burger King Corp., 471 U.S. at 472, 476-77); see ALS Scan, Inc.v. Digital Serv. Consultants, Inc., 293 F.3d 707, 713 (4th Cir. 2002) (referring to "the requirements for establishing specific jurisdiction …, which require[] purposeful conduct directed at the State and that the plaintiff's claims arise from the purposeful conduct") (emphasis in original).

On the other hand, when the cause of action does not arise out of or relate to the defendant's contacts with the forum state, the defendant may be still be subject to general jurisdiction. Helicopteros, 466 U.S. at 414-15. In order for a court to have general jurisdiction over a defendant, the defendant's activities in the forum state must have been "continuous and systematic," Int'l Shoe Co., 326 U.S. at 317, and "substantial," Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 447 (1952), "a more demanding standard than is necessary to establish specific jurisdiction." ALS Scan, Inc., 293 F.3d at 712. The "casual presence of the corporate agent or … his conduct of single or isolated items of activities in a state

7

in the corporation's behalf are not enough to subject it to" general jurisdiction. <u>Int'l Shoe Co.</u>, 326 U.S. at 317.  In some situations, "continuous activity of some sorts within a state [may] not [be] enough to support" general jurisdiction. <u>Id.</u> at 318.  "Purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction." <u>Helicopteros</u>, 466 U.S. at 417 (citing <u>Rosenberg Bros. & Co. v. Curtis Brown Co.</u>, 260 U.S. 516 (1923)).  Neither are advertising and solicitation alone sufficient for jurisdiction.[3] <u>Nichols v. G.D. Searle & Co.</u>, 991 F.2d 1195, 1200 (4th Cir. 1993) (citing <u>Ratliff v. Cooper Labs., Inc.</u>, 444 F.2d 745 (4th Cir. 1971)).  "Contacts between the corporation and the state must be fairly extensive before the burden of defending suit [in the forum state] may be imposed upon it without offending traditional notions of fair play and substantial justice." <u>Ratliff</u>, 444 F.2d at 748 (internal citations omitted).  Thus, "[o]nly when the 'continuous corporate operation [sic] within a state [is] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities' may a court assert general jurisdiction over a corporate defendant." <u>Nichols</u>, 991 F.2d at 1199 (quoting <u>Int'l Shoe Co.</u>, 326 U.S. at 318).

---

[3]The Fourth Circuit held in <u>Lee v. Walworth Valve Co.</u>, 482 F.3d 297, 298-99 (1973) that defendant's activity in the forum state, South Carolina, "was neither isolated nor casual" when its non-resident salesmen solicited business in South Carolina seventy-five to eighty-five days a year from 1969 to 1971 and resulting sales totaled several hundred thousand dollars a year from 1969 to 1971.  Notably, the cause of action arose at sea off the coast of Cuba such that no "other state['s] … courts might provide a more likely forum." <u>Id.</u>; <u>see also</u> <u>Nichols v. G.D. Searle & Co.</u>, 991 F.2d 1195,1199, n. 3 (4th 1993).  Over the ensuing decades, though, the Fourth Circuit has determined that "[its] decisions since <u>Lee</u> make clear that even the contacts in <u>Lee</u> were marginal." <u>ESAB Group, Inc. v. Centricut, Inc.</u>, 126 F.3d 617, 624 (4th Cir. 1997).

## V. Personal Jurisdiction Analysis

It is difficult to determine which type of personal jurisdiction Culp is asserting over the Defendants.  In its complaint, Culp claims jurisdiction by stating, "Defendants regularly and actively conduct business in this state and judicial district and are subject to the jurisdiction of this Court." Compl. ¶ 6.  This language supports an assertion of general jurisdiction, and the complaint does not allege the copyright infringement arose out of or relates to Defendants' activities in North Carolina. Id.  However, in Culp's brief in opposition to Defendants' motion to dismiss, Culp "submits that the Court may exercise specific jurisdiction over Defendants" based on the actions of two of HFI's North Carolina-resident independent contractors. Pl.'s Br. in Opp. 3, n. 3.  As a result, the following analysis addresses whether the Court may exercise specific or general jurisdiction over HFI, Mr. Waterer, and Mrs. Waterer.  Ultimately, it is determined that the Court may not exercise specific or general jurisdiction over any of the Defendants.

### A. Personal Jurisdiction over HFI

#### 1. Specific Jurisdiction

There is no evidence that the alleged copyright infringement arises out of or is related to HFI's activities in North Carolina.  HFI began purchasing and selling a fabric known as "Wyatt" in 2005. Dep. C. Waterer 13-14.  According to Culp, the Wyatt fabric is "identical or substantially similar to" its Palomino design. Compl. ¶ 12.  HFI purchased Wyatt from Chinese suppliers from June 2005 to early fall

9

2007[4] and sold it through January 2009.  Dep. C. Waterer 13-14.  However, Mr. Waterer denies HFI's representatives ever sold or marketed the Wyatt fabric in North Carolina or to a North Carolina customer.  Id. at 15, 17; Defs.' Resp. to Int. 10, 11.  Of the HFI customers who did buy Wyatt fabric, only one, to Mr. Waterer's knowledge, attended the High Point markets. Dep. C. Waterer 18.

Nonetheless, Culp believes that this Court can exercise specific jurisdiction over HFI because of the actions of two of HFI's North Carolina-resident independent contractors, Jeanne Corey and Charles Simmons.  Ms. Corey visited HFI in Mississippi in July 2007, saw the Wyatt fabric, and asked for a small amount.  Defs.' Resp. to Int. 10.  Later, Mr. Simmons returned to Mississippi and asked for three yards of Wyatt fabric, which he received at no charge. Id.  Other than Mr. Waterer's assumption that Ms. Corey used the sample in her interior design business and Mr. Simmons used the three yards for his motorcycle, Dep. C. Waterer 63-64, there is no evidence to suggest the disposition of the Wyatt fabric that Ms. Corey and Mr. Simmons acquired.  Simply because two North Carolina residents who were HFI's independent contractors acquired at no charge, apparently on their own volition, Wyatt fabric from HFI in Mississippi does not reasonably imply that copyright infringement took place in or was related to HFI's activities in North Carolina.

---

[4]Shortly after stating in his deposition that HFI last purchased Wyatt from its Chinese suppliers in the fall of 2007, Mr. Waterer stated that he believed the last order was in the fall of 2008. Dep. C. Waterer 14.  This discrepancy does not make a difference in the Court's analysis.

Assuming _arguendo_ that HFI purposefully availed itself of the privilege of conducting business in North Carolina, the evidence does not support the inference that the alleged copyright infringement arose out of or was related to HFI's purposeful conduct in North Carolina. This conclusion is further supported by the lack of evidence that the Waterers or any HFI representative purchased, marketed, displayed, discussed, or sold Wyatt fabric in North Carolina or to North Carolina customers.

### 2. General Jurisdiction

Culp asserts that the Court has general jurisdiction over HFI due to its "regularly and actively conduct[ing] business in this state and judicial district." Compl. ¶ 6. On the other hand, HFI argues that it has insufficient contacts to justify this Court's exercise of jurisdiction. Defs.' Br. in Support 1 [Docket No. 13]. Although HFI's activities in North Carolina are "possibly sufficient to constitute 'presence[,]' [they] are nonetheless minimal." Ratliff, 444 F.2d at 748. Thus, "maintenance of the suit [in North Carolina would] offend traditional notions of fair play and substantial justice." Int'l Shoe Co., 326 U.S. at 316 (internal citations omitted).

### a. Corporate Organization

Not only is HFI a Mississippi corporation with its primary place of business in Tupelo, Mississippi, but it is registered to do business only in Mississippi. Decl. C. Waterer ¶ 2. HFI has never had an office, showroom, or any place of business in

North Carolina. Defs.' Resp. to Int. 6. It owns no real estate and holds no accounts in North Carolina. Decl. C. Waterer ¶ 5. HFI does not operate a website and has not placed advertisements in North Carolina. Id. Moreover, all of its employees are employed at HFI's Tupelo, Mississippi place of business. Defs.' Resp. to Int. 6. See Ratliff, 444 F.2d at 748 (finding the exercise of jurisdiction unwarranted because, although defendant employed five residents of the forum state, it maintained no office, warehouse, or bank account in the forum state, owned no real or personal property in the forum state, and did not advertise in directories in the forum state).[5]

### b. Travel to North Carolina

From 1992 to 2008, at least one representative from HFI traveled to North Carolina to attend the High Point pre-market, furniture market, or fabric market. Defs.' Resp. to Int. 3. With the exception of 2008,[6] HFI representatives visited these markets at least four times each year. Id. at 4-5. The lengths of stay for each visit from January 2004 to April 2008[7] range from only one or two days to six days, totaling at most twenty-one days in one year in North Carolina.

---

[5]No plaintiff in Ratliff lived in the forum state, South Carolina. 444 F.2d at 746. Moreover, the Ratliff court believed the plaintiffs' "only interest in South Carolina [was] its relatively long statute of limitations." Id. However, Ratliff is cited and relied on for the holding in Nichols that "advertising and solicitation activities alone do not constitute the 'minimum contacts' required for general jurisdiction." Nichols, 991 F.2d at 1200. See infra note 10.

[6]One HFI representative visited High Point, North Carolina once in 2008. Defs.' Resp. to Int. 5.

[7]HFI provided credit card records detailing travel during this time period only. See Defs.' Resp. to Int. 3-5, 12-13.

Specifically, Mr. Waterer, Mrs. Waterer, their son Rusty, and/or Todd Miller, another sales representative, made the following trips to High Point, North Carolina: 2004 - five separate visits ranging from one to six days for a total of sixteen days in North Carolina; 2005 - seven separate visits ranging from two to four days for a total of twenty-one days in North Carolina; 2006 - five separate visits ranging from two to four days for a total of thirteen days in North Carolina; 2007 - four separate visits ranging from two to three days for a total of nine days in North Carolina; 2008 - one two-day visit in North Carolina. Id. at 3-5, 11-13. See ESAB Group, Inc., 126 F.3d at 624 (noting that defendant's activities in Lee, 482 F.3d at 298-99, are now considered marginal where defendant's non-resident salesmen solicited business in the forum state seventy-five to eighty-seven days a year over three years and resulting sales those years totaled several hundred thousand dollars per year).

HFI representatives attended the markets for a variety of reasons. The purpose of HFI's representatives, including Mr. and Mrs. Waterer, in attending the furniture markets was "as PR just to show up and let everybody know [HFI was] still in business." Dep. C. Waterer 23. HFI did not have a booth at the market, but HFI representatives took samples, usually closeouts, to the show. Id.; Decl. C. Waterer ¶ 10. Representatives successfully marketed the fabrics and left samples with customers who would subsequently call HFI. Dep. C. Waterer 24. Whether or not HFI gained new customers from its representatives' efforts at the furniture

market is difficult to determine.[8] Id. at 23-24.  In addition, at the furniture and

fabric shows, HFI representatives would tour the exhibitions, talk with individuals

at the shows, and visit exhibitions of its customers who were "principally located

in Mississippi." Defs.' Resp. to Int. 3.  Most of HFI's North Carolina customers did

not show at the High Point furniture market. Dep. C. Waterer 55.  At the fabric

shows, HFI representatives acted primarily as buyers, looking at available fabric

and occasionally purchasing samples, usually fifteen yards' worth. Id. at 19-20,

22.

    While in North Carolina for the markets, HFI representatives visited several

of HFI's North Carolina suppliers, id. at 42-45, but not regularly and not for any

significant length of time.  HFI representatives[9] visited Specialty Textile Interiors in

Kings Mountain, North Carolina for an hour on the way to a pre-market show in

September 2005. Id. at 42.  HFI representatives also visited Global Textile Alliance

at its showroom in Greensboro, North Carolina for an hour during a pre-market

fabric show. Id. at 43-44.  In addition to Specialty Textile Interiors and Global

Textile Alliance, HFI representatives also visited the showrooms of Richloom,

---

[8]Mr. Waterer contradicts himself as to whether HFI gained new customers through its
activities at the markets.  Mr. Waterer was asked whether HFI gained any new customers out of the
furniture show to which he responded "No." Dep. C. Waterer 23.  However, during the same line of
questioning, but specific to taking fabric samples to the furniture shows, Mr. Waterer was asked
whether HFI gained any new customers out of the show. Id. at 23-24.  Mr. Waterer stated, "I'm
sure we did." Id. at 24.

[9]In his deposition, Mr. Waterer refers to "I" and "we" when discussing HFI's visits with its
suppliers. Dep. C. Waterer 42-45.  Therefore, it is difficult to discern whether Mr. Waterer, Mrs.
Waterer, both, neither, or some combination of the Waterer family and Mr. Miller visited HFI's
suppliers.

Swavelle Mill Creek, Advantage Fabrics, Dietsch, suppliers and potential suppliers of HFI, while at the fabric shows. Id. at 44-45.  There is no indication of the frequency or duration of these visits.

<u>c. Purchases from North Carolina Suppliers</u>

Although HFI bought "a significant quantity of fabric from North Carolina companies" from 2001, when it first purchased from North Carolina suppliers, to 2004/2005, its purchases of fabric from North Carolina companies has since steadily declined. Id. at 31-32; Decl. C. Waterer ¶ 9.  HFI lacks purchase records prior to July 2005, but the records dating from 2005 indicate that HFI purchased less than $4 million worth of fabric from Global Textile Alliance and Specialty Textiles that year. Defs.' Resp. to Int. 5, 8-9.  In 2006, HFI purchased less than $3 million worth of fabric from the same companies. Id.  Other than purchase orders, there were no written contracts between HFI and its North Carolina suppliers. Dep. C. Waterer 33-34.  Instead, the parties used a "verbal gentleman's agreement that HFI would pay X amount of dollars for X amount of fabric." Id. at 34.  Thus, there is no indication, other than sales two years in a row to two North Carolina companies, of an ongoing relationship between HFI and its North Carolina customers.

<u>d. Sales to North Carolina Customers</u>

At least ninety-five percent of HFI's customers were located in north Mississippi. Dep. C. Waterer 51.  However, HFI also sold fabric to twenty-one

North Carolina companies from 2005 to 2009, all of whom likely became aware of HFI when they attended the Tupelo, Mississippi fabric show. Defs.' Resp. to Int. 7; Dep. C. Waterer 55. HFI's sales to its North Carolina customers, as compared to the total annual sales, for 2005 to 2009 are as follows: 2005 - $37,843 sales in North Carolina with total annual sales over $24 million; 2006 - $42,854 sales in North Carolina with total annual sales over $17 million; 2007 - $18,634 sales in North Carolina with total annual sales over $12 million; 2008 - $67,429 sales in North Carolina with total annual sales over $7 million; 2009 - $4,819 sales in North Carolina with total annual sales over $1 million. Defs.' Resp. to Int. 5. HFI's sales to North Carolina customers totaled $171,578 from 2005 to 2009, just 0.28 percent of its sales during the period. Id.; see Nichols, 991 F.2d at 1198 (finding the exercise of jurisdiction unwarranted where the defendant employed representatives and managers in the forum state, supplied the representatives with samples, promotional materials, and a company car registered in the forum state and where annual sales in the forum state totaled just two percent of its annual sales).[10] These sales figures do not support a conclusion that a "substantial volume of merchandise [was being] regularly shipped by [HFI] to purchasers within the state," as was the case in International Shoe Co. 326 U.S. at 314-15. Despite

---

[10]A factor in the Nichols court's decision was that no plaintiff resided in the forum state, Maryland. 991 F.2d at 1198. The Fourth Circuit later explained that "[a]lthough the fact that none of the plaintiffs in Nichols were Maryland residents entered into our analysis, ... residency alone was not dispositive of the issue of whether the defendant had sufficient contacts to warrant jurisdiction." ESAB Group, Inc., 126 F.3d at 624.

these sales, HFI maintained no written contracts or verbal purchase agreements with these companies. Dep. C. Waterer 56. Moreover, once HFI fulfilled the customers' orders, HFI had no further communication with the customers. Id. at 51.

### *e. Hiring of North Carolina-Resident Independent Contractors*

In addition to its Mississippi employees and sales representatives, see Defs.' Resp. to Int. 5-6, HFI also hired independent contractors to sell its fabrics. From 1992 to 2009, HFI employed no more than ten independent contractors, three of whom, Jeanne Corey, Craig Stroup, and Charles Simmons, were North Carolina residents at the time of their contracts. Dep. C. Waterer 59; Defs.' Resp. to Int. 6. Ms. Corey and Mr. Stroup traveled throughout North Carolina and Tennessee for sales, but Mr. Stroup's work focused on east Tennessee. Dep. C. Waterer 59-60, 65. Mr. Simmons made his sales in Mississippi. Id. at 60. Although Ms. Corey, Mr. Stroup, and Mr. Simmons traveled on behalf of HFI, HFI did not reimburse them for their expenses. Id. at 58. As a result of their sales, the contractors earned a commission.[11] Ms. Corey earned $1,578.31 and $695.41 in commission for 2006 and 2007, respectively. Defs.' Resp. to Int. 6. HFI paid Mr. Stroup

---

[11]In Defendants' responses to Interrogatory 1, Defendants state that Ms. Corey's North Carolina sales totaled $52,610 in 2006 and $23,180 in 2007. Defs.' Resp. to Int. 6. However, in his deposition, Mr. Waterer corrected that answer. Those figures were Ms. Corey's total, not just North Carolina, sales. Dep. C. Waterer 62. The same is true for the figures in the Interrogatory response for Mr. Stroup. Id. Mr. Waterer did not know of a way to determine their North Carolina sales, but stated, "As you can tell from the numbers, not much." Id. Thus, the commission figures are likely a correct reflection of their commissions for North Carolina sales.

$1,133.10 and $720.31 in 2007 and 2008. Id. Mr. Simmons earned $974.63 in 2009. Id. Cf. Int'l Shoe Co., 326 U.S. at 313-14 (detailing that defendant's salesmen resided in the forum state and limited their activities to the state, received more than $31,000 in commission annually, and were reimbursed for renting sample rooms to display merchandise).

While HFI's contacts with North Carolina may support its presence in the state, they are not continuous, systematic, and substantial. As a result, the facts do not support this Court's exercise of general jurisdiction over HFI.

## B. Personal Jurisdiction over Mr. Waterer

Culp asserts personal jurisdiction over Mr. Waterer, just as it does for HFI, due to his "regularly and actively conduct[ing] business in this state and judicial district." Compl. ¶ 6. However, no such general jurisdiction can be exercised over Mr. Waterer. "The relevant inquiry is the action taken by the officer or employee." AARP, 604 F.Supp.2d at 799 (noting that this inquiry is necessary because the fiduciary shield doctrine, which provides that acts of a corporation's officer or employee transacting corporate business within the forum state do not provide jurisdiction over the corporate representative in his individual capacity, does not apply in states such as North Carolina where the long-arm statute is co-extensive with due process); Mkt. Am. v. Optihealth Products, Inc., No. 1:07CV00855, 2008 WL 5069802, at *8 (M.D.N.C. Nov. 21, 2008). "'General actions by such persons on behalf of the corporation will not generally subject them to an out-of-

18

state court's jurisdiction ....'" <u>AARP</u>, 604 F.Supp.2d at 799 (quoting <u>Mkt. Am.</u>, 2008 WL 5069802, at *8).

On behalf of HFI, Mr. Waterer traveled to North Carolina for the markets on eleven separate occasions from March 2004 to September 2007 totaling thirty-eight days.  Specifically, Mr. Waterer traveled to the markets during the following times: four days in March 2004, two days in September 2004, six days in October 2004, four days in January 2005, three days in March 2005, four days in April 2005, four days in October 2005, four days in April 2006, two days in October 2006, three days in March 2007, and two days in September 2007. Defs.' Resp. to Int. 4-5.  Mr. Waterer or another HFI representative has traveled to North Carolina for the markets since 1992, although available business records do not document which representative attended the markets prior to March 2004.  Other than these trips and attendance at a funeral, Mr. Waterer has not traveled to North Carolina.  <u>Id.</u> at 5.  Moreover, a representative, likely Mr. Waterer, occasionally visited with HFI's North Carolina suppliers when attending the markets.  As President of HFI, Mr. Waterer made all of the company's business decisions, including purchases from North Carolina suppliers since 2001, totaling nearly $7 million from 2005 to 2006.  He also directed HFI's sales, presumably to its twenty-one North Carolina customers.  However, these general actions on behalf of HFI are not sufficient to subject Mr. Waterer to this Court's jurisdiction.

Although such general actions cannot sustain jurisdiction, "'actions related

to the events in question may do so.'" <u>AARP</u>, 604 F.Supp.2d at 799 (quoting <u>Mkt.</u> <u>Am.</u>, 2008 WL 5069802, at *8).  In other words, a corporate representative may be subject to specific jurisdiction if he purposely availed himself of the privilege of conducting activities in the forum state, the claims arose out of or are related to those activities in the forum state, and the exercise of jurisdiction is constitutionally reasonable. <u>See</u> <u>Universal Furniture Int'l, Inc. v. Frankel</u>, No. 1:08CV395, 2009 WL 2853695 (M.D.N.C. Aug. 27, 2009) (involving a suit against a corporation's co-owner for copyright violation, the plaintiff already having succeeded in a separate action against the corporation).

Moreover, "[c]opyright violation is a tort." <u>Dash v. Mayweather</u>, No. 3:10-1036-JFA, 2010 WL 3420226, at *2 (D.S.C. Aug. 25, 2010) (citing <u>Beverly Hills</u> <u>Fan Co. v. Royal Sovereign Corp.</u>, 21 F.3d 1558 (Fed. Cir. 1994)).  The Fourth Circuit explained

> that when a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state …, he is properly subject to the jurisdiction of the forum court, provided the long-arm statute of the forum state is co-extensive with the full reach of due process.  On the other hand, if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the non-resident corporation and if any connection he had with the commission of the tort occurred without the forum state, … the nexus between the corporate agent and the forum state is too tenuous to support jurisdiction over the agent personally.

<u>Columbia Briargate Co. v. First Nat'l Bank in Dallas</u>, 713 F.2d 1052, 1064-65 (4th Cir. 1983); <u>see also</u> <u>AARP</u>, 604 F.Supp.2d at 799 ("A corporate officer who actively participates in a tort may be liable even if he or she was acting in a

20

corporate capacity.").

In Universal Furniture International, Inc., a case with a similar setting as the instant case, the High Point furniture market, the court determined it was able to exercise specific jurisdiction over the defendant.[12] 2009 WL 2853695 at *3. The defendant had purposely availed himself of the privilege of conducting activity in North Carolina because he was the co-owner of a company that owned real property in North Carolina on which the corporation's warehouse was located and personally managed and distributed furniture through the corporation's North Carolina warehouse. Id. The alleged copyright violation arose out of the defendant's actions in North Carolina because he caused the corporation to display items in North Carolina at the Furnishings Market, where he was present as owner and employee of the corporation. Id. The defendant was also allegedly responsible for the corporation's subsequent reproduction and distribution from the corporation's North Carolina warehouse of the furniture items in violation of plaintiff's copyright. Id. Finally, the court determined the exercise of jurisdiction was constitutionally reasonable because the defendant, through the corporation, had regularly conducted business in North Carolina and North Carolina had an interest in the case. Id. at *4.

Although at first blush Universal Furniture International, Inc. appears similar to the instant case, it is not. The distinction between the defendant's actions in

_____

[12]The court analyzed the exercise of jurisdiction using traditional specific jurisdiction analysis rather than focusing on the commission of a tort.

Universal Furniture International, Inc. and Mr. Waterer's actions lies in the location of the alleged commission of the tort. In Universal Furniture International, Inc., the defendant's alleged tortious acts took place in the forum state, North Carolina. Not only did he cause to be displayed in North Carolina copyrighted items that the corporation would allegedly reproduce and sell in violation of the copyright, but he oversaw the distribution of the reproductions from the corporation's North Carolina warehouse, which was located on property the defendant co-owned. On the other hand, neither Culp's allegations nor Mr. Waterer's admissions concerning the purchase and sale of the alleged infringing Wyatt fabric suggest that Mr. Waterer's alleged tortious activity took place in North Carolina. Culp's complaint does not allege the copyright violation arises out of or is related to Mr. Waterer's actions in North Carolina. Mr. Waterer denies ever having sold or marketed Wyatt fabric to North Carolina customers. Mr. Waterer owns no real estate and has no financial accounts in North Carolina, Decl. C. Waterer ¶ 5; therefore, neither could have been used to commit the alleged violation. Consequently, the "nexus" between Mr. Waterer and North Carolina is "too tenuous" for the exercise of jurisdiction.

Not only did Mr. Waterer's alleged tortious activities not take place in North Carolina, they were also not "intentionally directed" at Culp in North Carolina. See AARP, 604 F.Supp.2d at 799 (quoting Calder, 465 U.S. at 790); see also Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397-401 (4th Cir. 2003) (applying the "effects test" from Calder, but finding the exercise of personal

jurisdiction was not warranted); <u>Static Control Components, Inc.</u>, 2006 WL

2042900 at *7-8 (analyzing the intentional tortious activity of the defendants and

exercising specific personal jurisdiction over them); <u>Musselwhite</u>, 1997 WL

34588522 at * 3 (applying the "effects test" and finding the plaintiff made a prima

facie showing of jurisdiction).

      The allegations against the individual defendants in <u>AARP</u>, Tina and Tom

Hennessy,[13] over whom the court decided the exercise of jurisdiction was

constitutionally reasonable, are similar to those Culp asserts against Mr. Waterer.

AARP alleged that the individual defendants "knew of, authorized and approved"

the mailings of infringing items and that they "received revenues" from such

mailings. 604 F.Supp.2d at 799.  Here, Culp alleges that Mr. Waterer, who has "a

direct financial interest in [HFI's] conduct," acted "knowingly and willfully"

because he had "knowledge of [HFI's] infringing activity, and … actively induced,

caused, or materially contributed to that infringing activity." Compl. ¶¶ 16, 24, 26.

      A key distinction, however, between the defendants' actions in <u>AARP</u> and

those of Mr. Waterer is that the defendants in <u>AARP</u> "expressly aimed their actions

toward North Carolina with knowledge that harm in this forum was highly

probable." 604 F.Supp.2d at 801.  Mr. Hennessy received two cease and desist

letters from AARP addressed to Mrs. Hennessy, but their corporation mailed

---

      [13] Tina Hennessy was the founder and sole officer, shareholder and director of defendant corporation, America's Recommended Mailers, Inc. <u>AARP</u>, 604 F.Supp.2d at 788, 800.  Tom Hennessy was the corporation's general manager. <u>Id.</u> at 800.

approximately 1.3 million infringing items to North Carolina after receipt of the first letter and 1.1 million to North Carolina after receipt of the second letter. Id. Mr. Hennessy realized after receipt of those letters that being sued was "a very real possibility." Id. The following year, the North Carolina Attorney General obtained a preliminary injunction against the corporation, enjoining it and the Hennessys from sending mailings to North Carolina customers. Id. However, after the injunction was issued, the corporation sent 64,000 infringing items to North Carolina. Id. The court not only found that AARP's infringement claims arose out of or related to the Hennessys' activities in North Carolina, but that the Hennessys "purposeful[ly] direct[ed] [their] allegedly tortious activity into North Carolina for commercial gain with the knowledge that harm was likely to occur." Id.

Here, Mr. Waterer stated that he made all of HFI's decisions concerning purchases, sales, and advertising. Thus, he likely played a significant role in HFI's purchases and sales of the allegedly infringing Wyatt fabric. HFI purchased Wyatt fabric from China from 2005 to 2007/2008, last selling the fabric in January 2009. However, Mr. Waterer denies HFI sold or marketed the Wyatt fabric in North Carolina or to any North Carolina customer. Of the HFI customers who purchased Wyatt fabric, only one to Mr. Waterer's knowledge even attended the markets in High Point. The only apparent connection between North Carolina and the Wyatt fabric[14] is Ms. Corey's and Mr. Simmons's acquisition of samples of

---

[14]Arguably, Culp, the owner of the Palomino copyright, would feel the impact of copyright infringement at its headquarters in North Carolina. Although this is "relevant to the inquiry," "the

24

Wyatt fabric from HFI's Mississippi headquarters. None of the evidence suggests that Mr. Waterer expressly aimed his allegedly tortious actions involving Wyatt fabric at North Carolina.

In sum, the evidence does not support this Court's exercise of either general or specific jurisdiction over Mr. Waterer.

## C. Personal Jurisdiction over Mrs. Waterer

Just as it does for HFI and Mr. Waterer, Culp asserts jurisdiction over Mrs. Waterer because she "regularly and actively conduct[s] business in this state and judicial district." Compl. ¶ 6. The evidence in support of personal jurisdiction over Mrs. Waterer is weaker than that for Mr. Waterer. Although Mrs. Waterer is a co-owner, one of HFI's two directors, Vice President, Treasurer, and Secretary of HFI, her only connection to North Carolina arises from her travel to the High Point markets as a sales representative. Mrs. Waterer traveled to North Carolina for the markets on ten separate occasions from October 2004 to September 2007, totaling thirty-four days. Specifically, Mrs. Waterer made the following visits to the markets: six days in October 2004, four days in January 2005, three days in March 2005, four days in April 2005, four days in October 2005, two days in December 2005, four days in April 2006, two days in October 2006, three days in March 2007, and two days in September 2007. Defs.' Resp. to Int. 4-5. Other than this travel and attendance at a funeral, Mrs. Waterer has not traveled to North

---

plaintiff <u>always</u> feels the impact of harm [in its home state]." <u>ESAB</u>, 126 F.3d at 626 (emphasis in original).

Carolina. <u>Id.</u> at 5. Such "general actions" on behalf of HFI do not support the exercise of jurisdiction. Further, there is no evidence that Mrs. Waterer targeted any of her alleged infringing conduct at North Carolina. She owns no real property and maintains no financial accounts in North Carolina, Decl. C. Waterer ¶ 5; therefore, she did not use such to perpetrate the alleged tort. HFI representatives never sold or marketed Wyatt fabric in North Carolina, presumably even at the High Point markets, or to North Carolina customers. According to Mr. Waterer, Mrs. Waterer made no decisions regarding purchases, sales, or advertising for HFI. Dep. C. Waterer 11. In sum, the evidence does not support this Court's exercise of either general or specific jurisdiction over Mrs. Waterer.

### VI. Conclusion

Culp has failed to meet its burden as to HFI, Mr. Waterer, or Mrs. Waterer. Thus, this Court may not exercise specific or general jurisdiction over any Defendant.

Culp has fourteen days from the entry of this Opinion on CM/ECF to file a motion with this Court seeking transfer to the appropriate court. If Culp has not filed a motion by 5:30 p.m. fourteen days from the entry of this Opinion, this Court will order that Defendants' motion to dismiss for lack of personal jurisdiction [Docket No. 12] be granted.

This the day of March 25, 2011

                                                               __/s/ N. Carlton Tilley, Jr.__
                                                        Senior United States District Judge